UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE                                          )
                                               )
VINCENT E. LORENCA and                         )    No. 09 B 32962
ALINA T. LORENCA,                              )
                                               )
                                               )
            Debtors.                           )

FINDINGS OF FACT AND CONCLUSIONS OF LAW
ON MOTION OF UNITED STATES TRUSTEE
TO DISMISS CASE UNDER § 707(b)(3)

The United States Trustee (the "U.S. Trustee" or "Movant") has moved to dismiss this Chapter 7 bankruptcy case pursuant to 11 U.S.C. § 707(b)(3) (the "Motion"). Debtors objected and the issue was set for trial as a contested matter. After evidentiary hearing, the following Findings of Fact and Conclusions of Law are made and to be entered. Pursuant thereto, Debtors will be given a short period to divest themselves of an investment property and convert to Chapter 13 and file a 60-month Plan providing at least $482.00 monthly to their creditors, or else this case will be dismissed. Should they do so, the request of Movant that Debtors also divest themselves of their residence will be denied.

FINDINGS OF FACT

1.  On September 4, 2009, the Debtors filed their voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

2.  Debtors are married and have three young dependents enrolled in a public school near their home. According to Schedule I, the Debtors have monthly gross income of $7,677.00 from their employment, plus another $1,300.00 from income-producing property, leaving combined average

net monthly income of $7,874.00 after withholdings. Debtors list monthly disposable income of <u>negative</u> $467.51 on their Schedule J, after deducting $5,132.79 in expenses on their residence, $1782.00 in expenses on their investment property, and other living expenses.

3.   Debtors reside in a single family residence located at 11721 Azure Drive, in Frankfort, Illinois, which they value at $493,000.00 and on which they pay a total of $5,132.79 for their monthly mortgage payment, real estate taxes, and homeowners' insurance. They plan to reaffirm the mortgage thereon and continue to live there. The Movant contrasts expenses for that home with the Internal Revenue Service published housing allowance of $2,103.00 for a household of five living in Frankfort, Illinois, but no evidence was offered to show that Debtors could actually rent a particular home for that amount that could service their family needs for space and location near jobs and schools. Nor was evidence offered to show that their home was acquired on eve of bankruptcy with a motive to incur mortgage debt instead of using cash flow to pay unsecured creditors.

4.   The Debtors still own their former home which they could not sell when acquiring the current home. No evidence contradicted Debtors' contention that their former home (now the income property) could not be sold when they acquired the current house. The former home is now a rental property located at 7319 Colony Lane, #2h, in Frankfort, Illinois. It is the source of monthly income of $1,300.00 noted above. It is asserted by Debtors to have a fair market value of $176,000.00. They pay $1,782.00 for a monthly mortgage, taxes, and homeowners' association fees. Therefore, Debtors must pay out $482.00 each month more than this property earns, but nonetheless they plan to reaffirm the mortgage thereon. When Debtors acquired their present home they were

stuck in a falling housing market with an inability to sell the old house. In hopes of a better real estate market to come, they rented out the old house and plan to reaffirm the mortgage thereon.

5. Debtors' unsecured debt is primarily consumer debt; their Schedule F lists $87,7500 in unsecured nonpriority debt. But Movant concedes that no presumption of abuse arises under 11 U.S.C. § 707(b)(2). The Debtors passed the "means test," and apart from considerations raised by the instant motion, they are qualified to seek discharge under Chapter 7 of the Bankruptcy Code.

6. Fact findings set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

The Court has jurisdiction to hear and determine this matter pursuant to 28 U.S.C. § 1334 and it has been referred to here under IOP 15(A) of the District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

"The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" Marrama v. Citizens Bank of Mass., 549 U.S. 365, 367, 127 S. Ct. 1105, 1107 (2007) (quoting Grogan v. Garner, 498 U.S. 279, 286, 287 (1991)). Movant concedes that Debtors may be honest, but argues that they are not unfortunate because they are living in one home and also hold investment realty. Given the totality of the Debtors' circumstances, Movant asks that Debtors' case be dismissed under 11 U.S.C. § 707(b)(3). He seeks by this Motion to pressure them to divest themselves of both properties, move into a rental property located somewhere else (and, of course, take their children to some other schools), and then convert this case into a Chapter 13 or Chapter 11 case under a plan that would pay the resulting expense savings to creditors.

Where, as here, no presumption of abuse arises under § 707(b)(2) of the Bankruptcy Code, § 707(b)(3) permits a bankruptcy judge to consider whether the case should be dismissed based on other reasons. Under the U.S. Trustee's Motion, the judge "shall consider" whether the case was filed in "bad faith" under § 707(b)(3)(A), and, alternatively, whether "the totality of the circumstances of the debtor's financial situation . . . demonstrates abuse." § 707(b)(3)(B).

The foregoing provisions provide authority to make such decisions, but there are no statutory standards for evaluating whether or not circumstances demonstrate "bad faith" or "abuse" warranting case dismissal even when all Bankruptcy Code requirements, including the means test, have been complied with. Judicial authority not governed by standards may tempt one to apply unrestrained judicial discretion directed only by personal attitudes and values. That invites judicial application of a personal smell test, however rationalized by some list of considerations. In short, statutory discretion without statutory standards can lead to judicial ruling based on experiences, temperament, and even prejudices that may amount to little more than the famous comment on obscenity that one knows it when one sees it. See Jacobellis v. State of Ohio, 378 U.S. 184, 197 (1964) (Stewart, J., concurring). A bankruptcy judge should rather seek guidance to inform use of this discretion from general purposes of the Bankruptcy Code, and apply the discretion with restraint given the harsh possible impact on lives of debtors and their families.

A recent thorough discussion by Judge Barbosa of this District of possible standards for applying §§ 707(b)(3)(A) and (b)(3)(B) gives some considerations to guide the analysis. See In re Deutscher, 419 B.R. 42, 44-46 (Bankr. N.D. Ill. 2009). Judge Barbosa wrote:

> 11 U.S.C. § 707(b)(1) gives the Court the power, after notice and a hearing, upon a motion by the U.S. Trustee, to dismiss a case filed by an individual debtor under Chapter 7 whose debts are primarily consumer debts if the Court finds "that the

-4-

granting of relief would be an abuse of the provisions of [Chapter 7]." Although Section 707(b)(2) sets out a means test, which, if failed, creates a presumption of abuse, Section 707(b)(2) only creates a <u>presumption</u>, and is not the only way that abuse may be proved. Section 707(b)(3) states that:

> (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider-
>
> (A) whether the debtor filed the petition in bad faith; or
>
> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3) (2009). As the Seventh Circuit Court of Appeals has stated, failing the means test "simply means that the debtor's petition is not <u>presumed</u> abusive . . . the UST can still request dismissal . . . under section 707(b)(3), either for bad faith or based on the totality of circumstances (which can take into consideration a debtor's actual income and expenses)." <u>Ross-Tousey v. Neary (In re Ross-Tousey)</u>, 549 F.3d 1148, 1161-62 (7th Cir. Dec. 17, 2008). Under the totality of the circumstances test, "a debtor's ability to pay may be the most relevant factor, but the Court must also consider: (1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability or unemployment; (2) whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to pay; (3) whether the debtor's proposed family budget is excessive or unreasonable; and (4) whether the debtor's schedules and statements of current income and expenses reasonably and accurately reflect the true financial condition." <u>In re Cutler</u>, 2009 WL 2044378, at *3 (Bankr.S.D.Ind. July 9, 2009) (citing <u>In re Green</u>, 934 F.2d 568, 572 (4th Cir. 1991)). The focus of the means test under Section 707(b)(2) is on whether debtors have sufficient income to repay a substantial portion of their debt, <u>see, e.g.</u>, Eugene R. Wedoff, <u>Judicial Discretion to Find Abuse Under Section 707(B)(3)</u>, 71 Mo. L.Rev. 1035, 1036 (2006). Because this is also a factor under the totality of circumstances test, courts have struggled to define the intersection between Sections 707(b)(2) and (3). Some courts have expressed concern that a court might simply use Section 707(b)(3) to substitute its own test for the means test. <u>See, e.g.</u>, <u>In re Norckerts</u>, 357 B.R. 497, 506 (Bankr.E.D.Wisc.2006) ("To apply the means test, dislike the result, and then examine the debtor's ability to fund a chapter 13 plan under § 707(b)(3), renders the means test 'surplusage.'"). When addressing ability to pay under section 707(b)(3), a court must therefore be attentive to the policy choices made by Congress in drafting the means test, including the fact that it gave preferred treatment to secured creditors by allowing scheduled payments of secured

> debt to be listed as deductions without limitation. See, e.g., In re Le Roy, 2009 WL 357923, at *3 (Bankr.E.D.Wisc. Feb. 12, 2009) ("[T]he U.S. Trustee sought to reclassify the debtors' secured debt payments as income available to pay creditors. The court determined that the Code expressly permits the deduction of secured debt payments under the Means Test, thereby providing an advantage to secured creditors over unsecured creditors. To ignore the Code's mandate and disallow secured debt expenses allowed by the Means Test would violate Congressional policy."). **Thus, a court should not dismiss a case for abuse under Section 707(b)(3) solely because a debtor has a high amount of secured debt or solely because a debtor intends to reaffirm secured debt. However, this fact, when combined with other elements from the Green test, or when combined with evidence that the Debtor was attempting to manipulate the means test, could still demonstrate abuse.** Norckerts, 357 B.R. at 507-508. **Therefore, while a desire to reaffirm secured debt is not in itself abuse, a court can find abuse under the totality of circumstances when there is "evidence that the Debtor has manipulated the means test, purchased luxuries on credit on the eve of bankruptcy, altered his expenses in his Schedules, accrued significant debt prior to the petition, or that his budget is excessive or unreasonable."** Le Roy, 2009 WL 357934, at *4. Determination of whether a purchase is "on the eve of bankruptcy" or abusive, is a case-by-case determination, and, for example, the more expensive the purchase, the longer the time-frame before petition that it might still be seen as being on the eve of bankruptcy. See, e.g., In re Jensen, 407 B.R. 378, 386-87 (Bankr.C.D.Cal. Apr.28, 2009). Also, purchases "that cause the debtor to become insolvent generally give rise to a determination of abuse, regardless of the length of time that elapses between the purchase and the bankruptcy filing." Id.

Deutscher, 419 B.R. at 44-46 (emphasis in bold supplied). Attempted retention by the debtors of large, valuable, and expensive boats was held by Judge Barbosa to constitute abuse. Id.

A recent opinion by Judge Goldgar, another Bankruptcy Judge in this District, also resolved a motion by the U.S. Trustee under §§ 707(b)(3)(A) and (b)(3)(B). See In re Bacardi, No. 09 B 25757, 2010 WL 54760 (Bankr. N.D. Ill. Jan. 6, 2010). In that case, he applied discretion to force the debtors out of their most valuable property and into a less valuable home. The case dealt with debtors who earned a gross of $18,000.00 per month and owned three properties they initially sought to retain, valued by them at $790,000.00, $500,000.00, and $400,000.00. The heavy mortgage payments due each month, partly offset by a rental income, blotted up their income stream that

otherwise might be used to pay creditors. Of the three properties, one was intended for sale when they moved to their current home but could not be sold. The third property was a vacation home in Florida. They had exhausted more than $250,000.00 in retirement funds to pay mortgage and other expenses on all three properties, and after that they used credit cards to make such payments. Collapse of the real estate market reduced all property values below mortgage debts, and impaired their ability to sell any property. However, they announced to the Bankruptcy Judge a willingness to let two properties go to foreclosures and conceded that some of their scheduled expenses were excessive.

Judge Goldgar laid out his view of standards applicable to these facts:

> This U.S. Trustee is correct that this case is an abuse of chapter 7. The expenses that the U.S. Trustee identifies aside, the Bacardis are high income debtors living in an expensive house although they have a considerably less expensive house available to them. Surrendering the expensive house and retaining the less expensive one would permit the Bacardis to make a substantial payment to their unsecured creditors. Reducing some of the Bacardis' other expenses would permit an even more substantial payment.
>
> Section 707(b)(1) of the Bankruptcy Code permits the dismissal of a chapter 7 debtor's case if granting that debtor relief "would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1). Under section 707(b)(2), the court must "presume abuse" if a debtor fails the means test. Under section 707(b)(3), a court must dismiss the case of a debtor who passes the means test, or who manages to rebut the presumption of abuse under section 707(b)(2), if the debtor filed the petition in bad faith or if "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A)[sic], (B); In re Ross-Tousey, 549 F.3d 1148, 1161-62 (7th Cir. 2008).
>
> "Totality of the circumstances," a phrase that appeared in section 707(b) even before BAPCPA's 2005 revision of the Bankruptcy Code, is not defined, and the Seventh Circuit has never addressed it. The post-BAPCPA structure of the statute, however, gives some guidance to its meaning. Section 707(b)(2) creates an objective test under which some cases are presumed abusive. Section 707(b)(3) then permits dismissal even if a debtor passes the objective test, setting up a contrasting "totality of the circumstances" test that requires a more subjective, holistic assessment of the

debtor and his circumstances. See In re Sullivan, 370 B.R. 314, 319 (Bankr. D. Mont. 2007) (describing section 707(b)(3) as "subjection"); see also In re Haar, 373 B.R. 493, 499 (Bankr. N.D. Ohio 2007) (calling section 707(b)(3) an "equitable test" as opposed to the "rigid, mechanical formula" in section 707(b)(2)).

In addition, the separate requirement in section 707(b)(3)(A) that the court dismiss a case when the petition was filed in "bad faith" indicates that a case can be dismissed for abuse under the "totality of the circumstances" test in (B) based solely on ability to pay and without, for example, proof of misconduct on the debtor's part. In re Perelman, ___ B.R. ___, ___, 2009 WL 3490758, at *8 (Bankr. E.D.N.Y. Oct. 30, 2009). Some courts have held otherwise, see, e.g., In re Norckerts, 357 B.R. 497, 506-8 (Bankr. E.D. Wis. 2006) (holding that "more than the ability to fund a chapter 13 plan" must be shown to dismiss a case under section 707(b)(3)(B)), but these courts are a minority, see, e.g., In re Boule, 415 B.R. 1, 5 (Bankr. D. Mass. 2009) (declining to follow Norckerts); see also In re Jensen, 407 B.R. 378, 383 (Bankr. C.D. Cal. 2009) (same, and noting that "the majority of courts and commentators" disagree with Norckerts); In re Parada, 391 B.R. 492, 498 (Bankr. S.D. Fla. 2009) (same).

Before BAPCPA, the courts of appeals in six circuits had interpreted "totality of circumstances" by adopting open-ended, multi-factor tests. See Costello v. Bodenstein, No. 01 C 9696, 2002 WL 18211663, at *3 (N.D. Ill. Aug. 7, 2002) (citing cases). Except for the Fourth Circuit in In re Green, 934 F.2d 568 (4th Cir. 1991), these courts agreed that the primary factor in determining what the pre-BAPCPA version of the statute called "substantial abuse" (rather than merely "abuse") was the debtor's ability to repay his debts. See Costello, 2002 WL 1821663, at *4. These courts of appeals also concluded that an ability to repay debts standing alone could be sufficient to warrant dismissal, although other factors might be relevant. Id.

Other relevant factors could include whether the debtor has a stable source of future income, whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter, and other necessities, whether the petition was filed because of sudden illness calamity, disability or unemployment, whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to pay, and whether the debtor's schedules reasonably and accurately reflect his true financial condition. See Green, 934 F.2d at 572; In re Krohn, 886 F.2d 123, 127 (6th Cir. 1989). The "totality of the circumstances" analysis is fact-intensive and performed on a case-by-case basis. In re Stewart, 175 F.3d 796, 809 (10th Cir. 1999).

Bacardi, 2010 WL 54760, at *2-3. Even though the debtors were offering to give up two properties, the value of their residence and their income level induced a decision to grant the motion to dismiss for abuse. The opinion concluded:

> In sum, it is an abuse of chapter 7 for the Bacardis—high income debtors making over $200,000 a year—to keep an $800,000 house when they have a reasonable housing alternative readily available that will permit a substantial repayment to their unsecured creditors.[4]
>
> [4] This case would be an abuse even if the Bacardis had no second, less expensive home available to them. The Bacardis are high income debtors with excessive housing costs, costs they are effectively asking their unsecured creditors to bear. They have the ability to repay those creditors, at least in part, and should do so.

Id. at *6.

The foregoing two opinions illustrate somewhat different approaches and methods of analysis, but each rested on the ultimate finding that properties that debtors sought to hold onto were not needed by them in order to live because alternatives were available, and continued payments thereon took income that could otherwise be paid to creditors. Neither opinion found invidious acts on the eve of bankruptcy that warranted a finding of abuse, but the ability to pay creditors through divestment of some property was found to warrant each result.

The U.S. Trustee argues in this case that Debtors have expenses that could be reduced or eliminated without depriving them of adequate food, shelter, clothing, or other necessities. He emphasizes that the Debtors pay a total of $5,132.79 for their monthly mortgage payments, real estate taxes, and homeowner's insurance for their present residence at 11721 Azure Drive in Frankfort. This is $3,029.79 more than the IRS housing allowance that other debtors may be limited to if they do not pass the means test. See In re Wolf, 390 B.R. 825, 832 (Bankr. D.S.C. 2008) (holding that "IRS standard is not a fixed ceiling for reasonableness but is helpful as a guidepost").

Movant relies on In re Oot, 368 B.R. 662, 667 (Bankr. N.D. Ohio 2007), which found that a $430,000.00 house required so much to maintain that it could only be characterized as a "luxury" that warranted dismissing case under § 707(b)(3) unless the debtors divested themselves of their house.

Debtors also pay $1,782.00 for a monthly mortgage, taxes, and homeowners' association fees on their former home located at 7319 Colony Lane, #2h, in Frankfort, Illinois. Being unable to sell this property when they acquired their present residence, they leased it out. By eliminating this property now serving as an investment, they could eliminate $1,782.00 in expenses and also lose $1,300.00 in income. By also eliminating their present residence and acquiring rental property in the area within the IRS guideline, Debtors' expenses could be reduced from $8,341.51 to $3,529.72, leaving them with monthly disposable income of $3,044.28, enough to make a significant payback to their creditors.

The main thrust of the U.S. Trustee's argument rests on his assertion that Debtors' present residence valued by them at $493,000.00 is a "luxury" home because their monthly payments exceed the IRS standard for housing in their area. Based on this, the U.S. Trustee seeks to force them out of their home and into some rental property. The existence of decent housing in the rental market that is close to jobs and schools is presumed by Movant without proof merely because the IRS standards announce an average dollar cost of such housing. However, it is not clear that Congress intended the IRS housing allowance as a standard for determining reasonable housing costs. The IRS housing allowance operates as a floor: all debtors are entitled to at least the amount of the standard when calculating the means test, but if a particular debtor pays a higher amount on a mortgage, then that debtor is entitled to the higher amount. See 11 U.S.C. § 707(b)(2)(A). It would be odd indeed

for a value used as a minimum housing allowance to determine whether a presumption of abuse arises under § 707(b)(2) to then be used as a maximum housing allowance to determine whether a case is an abuse under § 707(b)(3). Even if the IRS housing allowance is useful as a guidepost for reasonableness of a debtor's housing expenses, recognition of the IRS standard is a far cry from deciding without evidence that decent rental housing is actually available to serve the needs of the family in this case.

Moreover, there has been great increase of housing values over the latter part of the recent century, leaving vastly increased value even after the housing bubble burst. Indeed, many in the middle class live in houses now worth a half-million dollars. It is all too simple to base the label "luxury" merely upon a stated home value and thereby justify an order to people to leave their home so as to provide maximum possible payment to creditors without proof of some invidious act or planning by the Debtors in acquiring that property. In this case, the rhetorical use of the word is more a protest against the Debtors continuing to live as comfortably as their neighbors. Neither Debtors nor the U.S. Trustee supplied any evidence that might relate to the issue. But since the U.S. Trustee has the burden of proof on the issue, the lack of evidence tends to undermine his case.[1]

---

[1] Neither the Movant nor the Debtors presented any evidence about the real estate market in Frankfort, Illinois. Sources of such information are readily available. For example, the United States Census Bureau provides a plethora of information about Frankfort Township (a region encompassing the Debtors' town of Frankfort and several neighboring towns), including the percentage of housing units that are rentals, the median rent, the distribution of home values (for example, the percentage of properties worth between $300,000 and $499,999), and the median home value. U.S. Census Bureau, *Frankfort Township, Will County, Illinois Selected Housing Characteristics: 2006-2008*, http://factfinder.census.gov/servlet/ADPTable?-geo_id= 06000US1719727631&-qr_name=ACS_2008_3YR_G00_DP3YR4 (last visited Jan. 27, 2010). That information could have been presented by either party through the testimony of an real estate expert under Rule 702 Fed. R. Evid., and evidence of this nature might have been helpful in determining whether the Debtors' home was in fact a home of such opulence above the level of average costs and quality in the community that it should be deemed wrongful to let them keep

The U.S. Trustee mainly argues that "disposable income" does not necessarily determine how much a debtor should pay in Chapter 13 or Chapter 11. Sections 1325(a)(3) and 1129(a)(3) each require that a plan be proposed in "good faith." He argues without evidence as to the real estate and rental market that good faith cannot exist where debtors shield their interest in investment property from creditors and continue living in a residence considerably more valuable and expensive than the U.S. Trustee feels is necessary.

Based on In re Johnson, 399 B.R. 72 (Bankr. S.D. Cal. 2008), disagreed with by In re Castellaw, 401 B.R. 223, 225 n.5 (Bankr. N.D. Tex. 2009), Debtors argue that given their secured debt, they have no disposable income to fund a Chapter 13 or Chapter 11 plan and that, therefore, they should be permitted to discharge their debt in Chapter 7.

To the extent that Johnson stands for the proposition that expenses allowed under the Chapter 7 means test are immune from attack under the totality of the circumstances test, Johnson is contrary to Seventh Circuit precedent. As stated in Ross-Tousey, "[p]ermitting a debtor to take the deduction—even where that deduction puts the debtor's current monthly income below the presumptive abuse threshold—does not insulate his case from dismissal. Instead, it simply means that the petition is not presumed abusive. Even if Chapter 7 debtors are not presumed abusive, the U.S. Trustee can still request dismissal, as he has done in this case, under § 707(b)(3), either for bad faith, or based on the totality of circumstances, which can take into consideration a debtor's actual income and expenses." 549 F.3d at 1161-62 (citations omitted). In light of Ross-Tousey, Johnson and its analysis must be rejected.

---

it for some reason. Unfortunately, no such evidence was offered and now such evidence cannot be considered. A judge cannot, of course, dig up evidence to be considered outside the record.

However, the Debtors' argument that they cannot afford any payment to creditors is disingenuous. They plan to reaffirm not only the mortgage debt on their home, but also the mortgage debt on their former home which now brings in some rental income. While their schedules report a negative cash flow of $467.51 after they pay the two mortgages and expenses on both properties, they are in fact doing so now and are planning on reaffirming both mortgages. The Debtors have somehow been able to cover their asserted deficiency and make payment on two mortgages. Instead, they could use their expenditures now made in saving the old house to pay their creditors. The old house costs $482.00 a month more than it brings in. If Debtors can pay that to save their former house, they can pay it to creditors.

## CONCLUSION

The Debtors in this case are not needy and testified to no sudden calamity. Instead of belt-tightening, however, the Debtors are asking that they be allowed both to keep their investment property as well as their residence. The investment property is in substance a savings plan for the Debtors, as eventually they would reap the benefit of any equity which the property accrues should market values rise. Keeping that property would defeat the purpose of the Code which seeks to have debtors pay what they can to creditors. They can, without stress, abandon the former home to foreclosure and use some part of their present payments on expenses for that property toward payment to their unsecured creditors in a Chapter 13 plan.

However, neither circumstances nor the purpose of the law warrant forcing the debtors from their home as the Movant seeks. The decision made here first recognizes the general protection of a debtor's home that bankruptcy law encourages, referred to in Judge Barbosa's opinion as "the policy choices made by Congress in drafting the means test, including the fact that it gave preferred

treatment to secured creditors." <u>Deutscher</u>, 419 B.R. at 45. It also recognizes the lack of proof of any invidious plan or gaming leading to the acquisition of Debtors' present house. However, the ability of Debtors to make some significant payments to their creditors by divesting themselves of their investment home requires the result that is ordered. Ability to pay has long been recognized in pre-BAPCPA bankruptcy law as a major ground that justifies case dismissal for abuse, as Judge Goldgar pointed out in his citation of several Circuit Court opinions. The discretion applied here should be guided by that history.

Accordingly, by separate order, Debtors will be given six weeks to divest themselves of their investment property, convert to Chapter 13, and file a plan. Otherwise, the Motion will be allowed and their case dismissed.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 29th day of January, 2010.